Is it Lepe or Leap? It's Lepe. Good morning members of the panel. I'm Russell Babcock. I represent Leonardo Lepe. Before I start, there's always a little bit of, or often a lot of confusion about what I can talk about. We've got an uncertified issue that's really wound up around this certified issue. And I just want to know if the court will entertain my speaking about that. Both parties have briefed on it extensively. Of course, that's the sufficiency of the murder argument in this case. Which uncertified issue are you saying you wish to discuss? The issue I wish to discuss, your honor, is whether there was sufficient evidence to sustain a murder in this case. As distinct from the premeditation, which was the certified issue? The first degree premeditation, correct. Well, I don't see any harm in arguing it. We'll ask the government if they consider it's been fully briefed normally with an uncertified issue. We won't decide it until both sides have had an opportunity to brief it. You clearly have briefed it. If the government believes it's briefed it sufficiently, because they have no obligation to, then we can ask for additional briefing. But certainly, it's close enough to the first degree question, just whether there was sufficient evidence for a murder at all, that I think you might as well argue it together. Thank you, your honor. I think part of the confusion was we had a pro se litigant in the beginning that didn't frame the issues exactly perfectly. So you have two separate issues. One, is there sufficient evidence that there was a murder? And if there is, is there sufficient evidence that it was first degree? That's correct, your honor. Is that correct? Yes, yes, absolutely. Starting off, I think the place that we need to look is the Court of Appeal decision by the California courts. We submit here that there was an unreasonable determination of facts in light of the evidence from the state court proceeding. As I start looking through this decision, I just see that there's a lot of things that they wrote about in here that just simply aren't true. Or there's a stretch on the facts. I mean, starting on page two, we've got there's substantial evidence that an appellant used his vehicle to block the decedent's vehicle at a gas station. That's a stretch on the facts. What we have is we've got a fact that he approached the car and angled his car near the car. And I think the record says kind of blocking it, but there's no indication. That's from Ms. Ponce? That's from Ms. Ponce, correct. But what's the difference between kind of blocking it and blocking it, in terms of this case? I think that the vehicle is completely blocking it, and there's no way to go backwards, or was touching it, or something like that. What does it matter? Because then they leave and they go into this on-ramp situation. I guess my point would be it just isn't quite as nefarious as it seems in the facts of the case. The cars are close to each other, and there may be a partial blocking in this case. So you're suggesting that things of that nature are what render this what? That it's just insufficient evidence? Or are you just saying that the Court of Appeals unreasonably applied the facts? Is that what you're saying? More than a second, Your Honor. The facts as we go on and we see them, there's a lot of facts that are just not quite 100% accurate that are used to bolster both the murder conviction and then the first degree element, the premeditation. Is the State Court of Appeals permitted in this sufficiency context to make inferences from what the jury could have found given the constellation of facts? Reasonable inference is absolutely correct, but not just rank speculation. And my point is a lot of these things as we go through them are nothing more than speculation. But is it material speculation? The example you just gave, whether it was fully blocked or partially blocked, the fact is from the perspective of the third party witness, the car couldn't get out. So that set up the initial discussion between your client and the decedent, right? Ms. Ponce never said that the car couldn't get out. She just basically said that it appeared to be partially blocking it. Let's say it's partially blocking, how do you get out? Kind of blocking it. If you're going to stick the State Court of Appeals to some kind of precision, then we have to really go to what the transcript says. Correct, kind of blocking it. Kind of blocking it. And so the fact that one vehicle is kind of blocking another vehicle, it's unreasonable to infer some kind of ill will from that. Even Ms. Ponce herself didn't. There was no shouting, there was no discussion, there was nothing unusual. She thought that perhaps these two people knew each other and they were conversing. So it seems to me that it's not reasoning, but it's a huge leap to basically say that based on that, there was ill will between these two people. All time people closely. Well, that's not the only thing she based that on. No, it's not the only thing, but it's one fact. All I'm saying is, if you're over here at a service station and I bring my car next to yours and I put it in a way that when you have the tanks in the back, you can't get out with, say, backing out, I'm sure you wouldn't view that as a very nice thing for me to do. You wouldn't be unhappy with that, right? Well, again, the record doesn't specifically say that the person couldn't get out. I don't want to keep going over the facts again. So there was a partial blocking. What I envision is maybe a car that's kind of got its nose in front of another car a few feet away. Where does the State Court of Appeals say they can't get out? I don't remember it saying at any point that the car could not get out. Right, so I don't know what we're arguing about. It's something I'm missing some point. I mean, I think that it's not helpful to kind of do in that kind of, you know, surgical analysis of how they did the facts if you get more to the larger issue. The point is, it seems that in so many places here, the facts are basically a stretch. We've got this situation with the vehicles, which I won't talk about anymore, that for some reason shows ill will automatically that provides a motive for a homicide. All right, if you're not going to talk about it anymore, let's get on to the other point. Okay. All right. The other thing about it is the pulling onto this on-ramp together, the fact that the car's getting the on-ramp together. That, again, is something that the court viewed as very nefarious and showing ill will. At that time in the morning, at 3, 3.30 in the morning, certainly people stop. They idle. They could be looking at their map. Counsel, forgive me, but perhaps you'll correct me how I read the record, but I thought that your client went away from the station, appeared to, his car was, you know, parked there. When the other, when the decedent drove out, then he came up right next to him, and they were talking according to the witness. Yes. The third-party witness. Kind of the idea that I see from facts is that my client pulled away and then kind of waited in the area, and then they inferred from that that he was waiting for the other vehicle. It's a reasonable inference, isn't it? It's one of the, it may not be the only inference, but it is a reasonable inference that a jury could have drawn, right? I don't think it's necessarily reasonable, and again, I don't want to nitpick, but for this reason. Number one, if you're trying to chase another individual or trying to follow another individual, at that particular place in the record, there were four places that the decedent could have driven, and so it becomes just a guessing game if somebody's trying to... But was that brought up to the jury? I mean, were all these exculpatory things brought to the jury, the jury could have considered it? I'm not sure if that specific fact was discussed, I think, in the... Let me just understand this, though. They're at the gas station, there appears to be some kind of interaction, but we don't know what it was. So then your client pulls out, and the inference, or at least the explanation, is that he waited, and in fact, those little lights that they have when you go on to one of these on-ramps, you know, they turn green, then they turn red, so he waited through that. In other words, he didn't go when he first could go, he waited, and that seems to be in the record, correct? Correct. Because she sees that from her perch. Yes. Ms. Ponce does, okay. Correct. He waits, and then the other car drives up behind him, is that right? I believe, yes. But then they get side-by-side, so that the ultimate gunshot goes through the right hand of the decedent's car. Yes. Which means your client is to the right, the decedent's car is to the left of this going on to the freeway ramp, right? Yes. And the gentleman who's in front, who's also a witness, basically says, you know, he sees that, and then the next thing he hears is like a tire pop or some big bang, right? Right. And then the police later see, well, there's a gunshot through the back right window, but it kills the decedent. Yes. I guess he wouldn't, yeah, it kills him, and then his car kind of goes astray. Your client's no longer at the on-ramp at that point, he's presumably on the freeway, because he's not on the on-ramp, and is that pretty much it? I think that's, from this record, there's probably a lot more out there, but that's what we have to work with, I think, here. Okay. Well, the state court said the jury could have concluded the defendant fired gun when vehicles next to each other. As I understood it, that the shots were through the rear window. How could it be that he fired them when they were next to each other, if the shot was through the rear window? That part was confusing for me as well, Your Honor. I didn't quite understand it. I did put in the brief the fact that if he'd really wanted to kill an individual, it would have probably been easier, unless he was left-handed, to go around the other side. Right. It makes more sense. Well, that's another point, except that the court said it's easier to shoot from the right side. I don't know whether that's a reasonable statement or an unreasonable one. I first thought that sounded right, and then it sounded to me like it was wrong. It's clearly some kind of an inference, but I don't know where they got that idea that it's easier to shoot. But then they said that he fired, jury could have said he fired it when they were next to each other. That's a separate point, because the evidence is that he didn't fire it when they were next to each other, but when he fired it from behind, because it went through the rear window. That doesn't make a lot of sense, either, when you think about it, because this woman can see all the way down the on-ramp. She has a small portion of it that's blocked by the bushes, but she says she can see the whole ramp. But, counsel, forgive me. I realize you're here to represent your client, but you're like you're trying a jury trial. We're not a jury. The jury made the decision here, and the question is whether there was sufficient evidence to convict. Right. You've got the third-party witness sees him drive up, you have another person that hears what probably was a gunshot. The decedent goes off the ramp. There's a gunshot, as I understand it, and his armpit goes in his heart. He's dead. Right. The reality is a jury found that your client killed him. Now, you can pick away at what the Court of Appeals said a little bit here and a little bit there, but the reality is are you really basing your case on the fact that there was an unreasonable application of the facts as your reason for overturning what was done here? No, that's only part of it, Your Honor. The other part is obviously the law, the part that I've briefed here. Maybe I've spoken too much about the facts, but my point is that these inferences, I understand we're not here to retry the case, but a lot of them just aren't reasonable. For example, the inference that he was waiting for him on the on-ramp. There's three other places to drive off. He had no way of knowing where he was going to drive. Well, you're saying it's not that the Court of Appeals unreasonably applied the facts, it's that the jury unreasonably made determinations. Is that what you're saying? I think that's where it started, and then the Court of Appeals has the duty to obviously look to see whether or not any reasonable juror in this case could have supported it, and so we have this whole kind of chain reaction taking place here. But wasn't the jury, was it argued to the jury, well, you can come out of the gas station and obviously going on the freeway is one route, but you could go another route. Was that argued to the jury? I can't recall, frankly, if that was one of the arguments. But you see, it matters. The facts matter. Yes. As does the law. So maybe you want to also address the law. Well, the law in this area is that there doesn't seem to be anything at all that would sustain first-degree murder. Let's just assume for a second that he did commit the homicide, which certainly we're not saying in this case. But any of the factors that you look at, you can start with Anderson, which is what California relies on real heavily. And I understand that Anderson is not the only way that you can get to first-degree murder. But, again, there has to be more than just simply a motive. First of all, I don't see any motive here, but let's assume for a minute that there was some motive. Well, let's just stop there, too, because didn't the State Court of Appeals also say even without motive it would have made the same decision? They did. Okay. But with these factors, what I'm kind of doing is trying to fish for something out there that could potentially sustain a first-degree murder conviction. And I'm not coming up with it at all. The point of motive, I think, is basically it has to be more than motive. It has to be motive coupled with kind of a substantial planning activity or a time period, weighing after careful thought and weighing considerations. So motive in and of itself doesn't, if there was motive, doesn't get us to first-degree murder. Okay. Going down the other list of the Anderson factors, planning activity. Here, again, there's nothing to indicate planning activity. There's nothing indicating at the time he left the gas station he had made a decision to kill Harbert. It's nothing more than speculation to assume that Lepe left the gas station having formed an intent to kill. If there was an intent, we don't know if it came up on the on-ramp or what happened down there. And then the final thing under Anderson is the preconceived design. And, again, there's a single gunshot here. This isn't like a lying-in-wait kind of a situation, an ambush with multiple gunshots. Well, it's like a lying-in-wait with one gunshot, right? I mean, that's the way the Court of Appeals defined it. Potentially. They were apparently driving alongside each other is what the Court of Appeals inferred. Well, the Court of Appeals found this premeditation or deliberation because of the manner of killing, it said. The nature of the bullet. And because he left the scene. I have a little problem with the difference between, as Judge Smith says, what a jury could have done and how a Court of Appeals explained it. Some of the reasons that the Court of Appeals gave for concluding that there was deliberation or premeditation are somewhat baffling to me. Whether that's an unreasonable application of the law or whether we say, well, the Court of Appeals didn't know what it was doing, but maybe it could have made a better argument. That wouldn't surprise me if the Supreme Court said, well, disregard what they said. We could make an argument for them. They didn't use the words lying-in-wait. But they said because he had that kind of a bullet and because he left the scene, that showed deliberation. And because he fired from the side and he actually fired from the back. I mean, I find the Court of Appeals' decision somewhat baffling. There's no evidence of any kind of flight here. We know that Mr. Lepe was getting on the on-ramp to go on the freeway. Well, he left the scene. If you assume that he fired the gun that killed him, he left the scene. Now, what that has to do with whether he deliberated before he fired the shot, I am not so sure. All right, well, we're way over time, so we'll give you a minute for rebuttal. Thank you. This is a bit of friendly advice. I'd concentrate on the certified issue more than on the uncertified at this point. Well, before I get to my argument, I would like to say good morning. My name is Jaime Fuster. I'm a Deputy Attorney General, and I represent the respondent in this case. I don't really have a problem if the Court has any questions about the first issue being the uncertified issue, which I believe wasn't whether there was a murder, but whether a penalty was the murder in this case. I believe that was the uncertified issue. The certified issue being whether the murder itself was premeditated. So you're saying that the uncertified issue was whether the defendant was even the person that did the killing. Is that right? That's right. And the second issue being whether the murder was premeditated. Right, but that's part of the certified issue, right? And I believe the evidence that shows premeditation is really pretty much the same evidence that shows that a penalty was the murder in this case. I think the problem with a penalty argument is that here's me picking at the Court of Appeal decision. I think that there are two layers of deference here that this Court must give to the State Adjudication. The first one is whether it was reasonable for the jury itself to find premeditation in this case based on the evidence presented at trial. And the second layer of deference is to the State Court of Appeal, whether it was reasonable for the State Court of Appeal to affirm the jury's finding of premeditation. What would you do if the State Court of Appeal wrote a decision that said, you know, we think this guy's a murderer because he's Hispanic. Hispanics don't like blacks, so we think he deliberated. I don't think the Court of Appeal ever made such a statement. I didn't say it did. This is known as a hypothetical question. Okay, what would you say we should do with a decision like that that was just off the wall? And you then get to the next question, well, the jury could have made the decision. Do we look at the decision of the Court of Appeals and say it's an unreasonable application of the law, but it doesn't matter because the jury could have found it anyway? I believe, as I said before, there are two layers of deference as far as the first layer of deference here, which should be to the jury. If there is sufficient evidence presented at trial by the prosecution to prove that Appellant murdered the victim with premeditation, that should be the end of the story. It doesn't matter what specific language was used by the Court of Appeals. If the decision could have been totally unreasonable, totally wrong in what it said, in its reasoning, we find deliberation because we don't like them. If they say that, we say, well, it doesn't matter what the Court of Appeals said. All that matters is the first layer of deference. Could the jury have done it? That's right. And we do that de novo? Well, if this Court were to find that the State Court of Appeals was unreasonable in the way that it reviewed the jury's decision, then it would be a de novo review. But even if there was a de novo review of the State Court decision, still there has to be deference to the jury in this case because this Court, just like the State Court of Appeals, has to be the evidence in the light most favorable to the prosecution. And as long as there is a reasonable inference that supports the jury's decision, that's all that matters. Whether an appellant can come up with new inferences that could be erased from the evidence presented in the trial, that's irrelevant. That was up to the jury to decide which inference to select among many of the ones. Like in this case, we have very specific facts that are mostly undisputed and are also fairly simple as to why an appellant killed the victim and why he premeditated. Both premeditated and deliberated? Both, and they are just one of them. You know, the key distinction between first-degree and second-degree murder under California law is not the Anderson test. That's just a test that is used by the appellate court to look at the evidence. The key distinction is whether the murder was the result of preexisting reflection as opposed to rash impulse. So I want to, because California may differ from some other states, so I want to get my understanding straight. So is premeditation and deliberation treated as one thing in California? Are they separate elements or is it a package? It's not really separate elements. It's just it's a concept that is viewed together. And as I said, the key distinction. So it's viewed together. That's right. But then Anderson, you know, tries to split it apart. But as I understand it, Perez basically says Anderson doesn't tell the elements. It just tells the framework. Is that right? Yes, because, you know, the jury wasn't even instructed on the elements. Well, not the elements, on the factors of Anderson. That's not, that's just a kind of a test used by the appellate courts to see whether there's sufficient evidence. You started to say the key distinction. What is the distinction between premeditation and deliberation? I think premeditated means more that it was thought ahead of time. While deliberated means that there was some thought process involved as to the consequences of your actions. So I think that's a way to look at it. You weigh the consequences. Yes. In deliberation, you have time to think about it. You weigh it. You make a reasoned decision. In premeditation, you do what? Premeditation means ahead of time, prior to the actual shooting. So it was before the defendant engages in some kind of thought process ahead of time. That's pretty much what it means. And I think the instructions that are given to the jury in California to make the distinction between first and second degree, key on that distinction between preexisting reflection about your actions versus rash impulse. And that's really the key distinction here. In this particular case, isn't it correct that what we're really looking at is whether, under Jackson, we can credit what the jury did apparently in saying that when the defendant went around, waited for the decedent to leave, came up beside him, and according to what the jury believed, shot him, that his waiting there for him was sufficient to permit him to deliberate and to premeditate what he then did. Is that what we're really talking about? That's right. I think the key here is to look at the facts of the case. You know, the most simple facts in this case are that Pelham waited illegally at several cycles of lights for the victim to get behind him.  Well, two sets of lights. The Pelham stopped at a red light at that left turn lane that will go into the freeway on-ramp. The light is red when he gets there. Then another car gets behind him. The light turns green. He waits illegally at the light. And then forces the car behind him to go around him and into the freeway. And at that point, is he in the left-hand lane of the going on-ramp? That's right. There's a left-hand lane that will go into a freeway on-ramp. So at that point, he's waiting at the red light. I mean, then the light turns green. He doesn't move. He waits there illegally and forces another car to go around him into the freeway on-ramp. Then the light turns green again. At this point, the victim's vehicle stops behind him. Then at that—once the light turns green again, then both cars move to the freeway on-ramp, which is a two-lane on-ramp. And it's a fairly long one, too. At that point, instead of just—you know, this is the Pelham ahead of the victim. Instead of just picking up, which is what most people will do, he actually slowly maneuvers his car to the right side and lets the victim drive slowly next to him on the left side. From that evidence, in addition to the evidence of waiting at the green light, from that evidence, it was more than reasonable for the jury to infer that the Pelham was planning a shooting because, first of all, he's in a fairly large SUV. It was a Ford Expedition. The victim is in a sedan. I think it's pretty reasonable to infer that he was at a higher perspective. And it would be at least reasonable, we could infer, that it would be a lot easier for the defendant to shoot through his own window into a vehicle that is lower than him than having to actually shoot through his own large cabin and down, somehow, down to a sedan that is below his passenger door. So I think it was more than reasonable. In our case, again, it's not what we would do if we were jurors. It's really not what the Court of Appeals did. If you look at the record, there's enough information, is there not, that a jury could have reasonably made those determinations. That's what we're really looking at, isn't it? That's right. That's the ultimate issue in this case. It's looking at the basic facts of this case, most of which were undisputed in this case. And was that enough for the jury to reasonably conclude that a shooting was premeditated? And delivered. Yeah, both. And I would like to just point out to the issue as to why the bullet actually went through the rear window as opposed to maybe the front passenger window. I mean, I think it was like what the Court of Appeals inferred was that obviously at some point that pen and bullet fired him out. At that point, it is reasonable to infer that the victim tried to take off. So instead of being able to shoot right through the front passenger window, the bullet went through the rear passenger window. Does that matter? I'm trying to figure out, does that matter? Because that's one more thing I think the defense counsel would say was a speculation as to why. Well, it's not a speculation because the evidence shows that they're driving next to each other. The evidence shows that seconds after the gas attendant sees the two vehicles moving slowly next to each other, there's a gunshot. The next thing we know is the victim is dead before he could even reach the freeway. The bullet went through the rear passenger window and hit him in the upper torso. So there's no speculation about that. Those are all basic facts in this case. From those facts, it was more than reasonable for the jury to infer that Perlan was, you know, with premeditation trying to shoot the victim from his own vantage that was, you know, one in which he was closer to the victim than if he was driving the other side. And if he wasn't able to shoot through the front window, it may just be because the victim saw the fire and tried to take off and before the victim could escape, Perlan shot him. And I think that's more than reasonable from the facts in this case. Was it through the rear passenger window or the rear window? No, the rear passenger window. And as I said, in this case, Perlan was driving a Ford Expedition, which is a fairly large SUV. The victim was in a sedan. So he's actually shooting down at, and as I said, it was more than reasonable for the jury and the court of appeals to infer that when Perlan maneuvered his car to the right-hand side in the on-ramp, he was getting what was clearly a better shot at the victim from a closer distance and without having to shoot through his own vehicle down at a sedan. So I think when... Do you know whether he was left-handed or right-handed? That I don't know, as I said. I mean, in this case, there could be many inferences that Perlan could come up with. Some of them were brought at trial. Some of them were brought on appeal. But the bottom line is we should look at the basic facts of the case, and those facts are more than enough for the jury to reasonably find premeditation in this case. And as I said, it is really irrelevant whether there were other inferences, since once we're done with the jury trial, the prosecution doesn't have to somehow contradict any other inferences from the evidence. We just need to be looking at the facts and whether it was reasonable for the jury to find premeditation from those facts, not whether some other inference could have been raised. I think it's a little late for Perlan to come up with new theories. Thank you, Ken. Thank you. All right, we'll give you a minute to rebut. There's one fact that could be important to the court that I just want to kind of point out. It appears to me from the record that he made it to the freeway, the car. Who did? The decedent. The decedent, because Ponce can see all the way down the ramp, and she doesn't see any cars on the ramp, and so he crashed into the guardrail there. So he probably didn't get very far down the freeway, but from the record here, I think we can assume that his car didn't crash, as counsel indicated, on the ramp, but he got down to the freeway, and that could be important because of the- Do we know from the record where the police found the crashed car against the guardrail? No, I went back and I looked there, but the only thing I could find is it would not have been on the ramp because of the fact that Ponce sees the ramp and she doesn't see the cars anymore. So I think the inference is he turned the corner and got onto the freeway and how far he went. The witness said he could live potentially up to 12 minutes. I think we can assume from the record here he didn't get very far down the freeway, probably got down the ramp. And then how does that matter? What difference does it make? Well, it could matter in terms of the shooting and the opportunity of other individuals. If we had a person that went all the way down the ramp and- You mean like somebody else might have at that very moment driven by and shot him instead of- We don't know. Very high likelihood of that, I think. In terms of just a couple other points, I think that one other thing that wasn't touched upon too heavily here but we need to look at is in the Court of Appeals decision there's a reference to a tattoo with the word Mexican on it and Aztec. And also the fact that the decedent was African American. Again, it goes back to my theme of speculation. What is that all about? Why does that matter? Why is that in the beginning of the Court of Appeals decision? There's no indication that my client was a killing member or anything like that. We have another point in the next 18 seconds or 16. Okay. The final point I think I would make is just we discussed first-degree murder and I think that there's a touchstone for first-degree murder. And that is the People v. Thomas case. Ultimately, first-degree murder only requires substantially more reflection than may be involved in the mere formation of a specific intent to kill. So specific intent to kill, if these two individuals, whoever they were, had an argument out there and one decided to kill the other, that's not enough under California law. You need more. Thank you very much. Thank you, counsel. The case is argued.
judges: Reinhardt, McKeown, Smith